UNITED STATES of America, Plaintiff,

v.

COLUMBIA PICTURES CORPORATION, Screen Gems, Inc., and Universal Pictures Company, Inc., Defendants.

United States District Court
S. D. New York.
Jan. 22, 1959.

**890**

Victor R. Hansen, Asst. Atty. Gen., Anti Trust Division, by John Sirignano, Jr., Brooklyn, N. Y., Edward J. Harrison, Streator, Ill., George Reycraft, Washington, D. C., Attorneys, Department of Justice, for plaintiff.

Schwartz & Frohlich, Arthur H. Schwartz, Stewart G. Schwartz, and Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Theodore Kiendl, Taggart Whipple, Richard H. Pershan, and Henry L. King, New York City, of counsel, for defendants Columbia Pictures Corporation and Screen Gems, Inc.

Adolph Schimel and Harold Lasser, New York City, for Universal Pictures Co., Inc.

RYAN, District Judge.

This civil anti-trust suit, filed by the United States on April 10, 1958, under Section 4 of the Sherman Act (15 U.S.C.A. § 4) and Section 15 of the Clayton Act (15 U.S.C.A. § 25) alleges that the defendants violated Section 1 of the Sherman Act (15 U.S.C.A. § 1) and Section 7 of the Clayton Act (15 U.S.C.A. § 18). The Government charges that these violations find origin in the making of and performance under a contract between Universal Pictures Company, Incorporated, and Screen Gems Incorporated executed on August 2, 1957 and dated as of July 1, 1957. The contract, described by the parties to it as the "Distribution Agreement", grants to Screen Gems, a wholly-owned subsidiary of Columbia Pictures Corporation, an exclusive license to distribute for exhibition over television certain listed and specified pre-August 1948 feature films of Universal.

Concurrently, Columbia, Universal and Screen Gems entered into a "Guaranty Agreement" wherein Columbia guaranteed to Universal the full, faithful and timely performance of the "Distribution Agreement" by Screen Gems, and by which Columbia further warranted, represented and agreed that Screen Gems would continue to be, during the term of the "Distribution Agreement", "the sole and exclusive licensee of the right to distribute for television exhibition substantially all motion pictures not constituting 'new motion pictures' * * * ever produced by Columbia or released for ·television by Columbia."

The suit comes before us on motions made by the Government for partial summary judgment adjudging that the defendants, by the making of these agreements and performance under them, have violated and are violating Section 1 of the Sherman Act; the Government also asks for an injunction pendente lite. The injunctive relief presently sought would not prevent the defendants from performance of sub-licensing agreements covering Universal films which have already been entered into by Screen Gems; the Government now seeks only to enjoin defendants from further sub-licensing these pre-August 1948 Universal feature films during the pendency of the action.

The contract between Universal and Screen Gems consists of 57 printed pages of apparently carefully drawn and considered provisions. The agreement deals with "all of the feature photoplays released for theatrical exhibition in the United States by or through Universal or its predecessors under the respective titles listed" in two schedules, "A" and "B", which are annexed to and are part of the agreement. The Universal pre-August 1948 feature films subject to the agreement number about 600 of which 586 had not been previously released for television exhibition; some of them are allegedly of poor quality, of little or no

value and unusable in the television market. The total number of usable Universal films did not exceed 535.

In August 1957, prior to the agreement, the inventory of Screen Gems had in it about 950 films, comprising the feature films of Columbia and those of the Hygo Television Films, Inc. The Hygo pictures numbered about 450; they practically had seen their run of the television market; they had been telecast, numerous times (15 or more) and were of inferior quality as compared with the Columbia and Universal productions.

The Columbia feature film catalogue consisted of no more than 500 pre-August 1948 productions, and 247 had been in national release for varying periods of time and had produced about 62% of their projected and estimated total income potential.

The Government states that Screen Gems "has available for future release 211 pre-1948 Columbia features and 434 pre-August 1948 Universal features." To date, 152 Universal pre-August 1948 feature films have been placed in distribution by Screen Gems under the agreement of August 2, 1957. There are left 383 Universal feature films still to be distributed under the agreement. This was not a release for distribution with unholy haste, when we consider that Section V.6 of the agreement obligates Screen Gems to release a minimum of 78 Universal feature films per year.

To date since the agreement, a total of 249 programs have been released by Screen Gems in four separate package offerings. These packages contain, in addition to 152 Universal feature films, 89 Columbia film programs and 8 Screen Gems re-runs. The four packages released by Screen Gems after execution of the Distribution Agreement consisted of the following films:

1. September, 1957—52 Universal films entitled "Shock Package";

2. December, 1957—9 Universal and 11 Columbia features entitled "Son of Shock";

3. January, 1958—52 Universal and 52 Columbia films, along with 8 "Playhouse 90" productions, called "Triple Crown" package;

4. June, 1958—39 Universal and 26 Columbia features in "Sweet 65" package.

In three out of the four packages released, Universal films were licensed together with Columbia features of the same general classification in the same package.

We are concerned then with the future distribution and licensing of the remaining 383 Universal feature films, all of the pre-August 1948 vintage.

The Government maintains in its motion for summary judgment that the distribution contract on its face constitutes an illegal agreement to fix prices in violation of Section 1 of the Sherman Act.

The statute, in pertinent part, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *". 15 U.S.C.A. § 1.

Sections V.3, V.14, V.7, XI.1 and XI.2, together with the Columbia guarantee, are pointed to as demonstrating that the licensing agreement on its face provides for price fixing condemned by the Supreme Court. United States v. Socony-Vacuum Oil Co., 1939, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

Section V.3 calls for the joint participation of Screen Gems and Universal in formulating "sales and other policies and decisions" relating to the pictures and their distribution. Section V.14 provides for four classifications of Universal films, according to audience appeal and income potential, to be made jointly by the parties; no Universal film may be classified inferior to any motion picture of the same appeal, quality, and value of Columbia. In Section V.7 the

parties agree that prior to release of any film, Screen Gems shall submit to Universal a "rate schedule" setting forth minimum sub-licensing fees; if Universal objects to the fees, Screen Gems and Universal are to confer to work out the objection; Screen Gems "shall at no time grant any sub-license on terms less favorable to Distributor (and thus to Universal) than for Columbia Product (or other motion pictures from time to time distributed by it) of similar or comparable appeal and value in similar situations at approximately the same time."

Although we do not consider it to be determinative on these motions, the defendants modified the distribution contract after service of the Government's motion for summary judgment. Defendants argue that the amendments remove the "price fixing" objections by eliminating entirely the above provisions and substituting the "fair market value" as the yardstick for sub-licensing fees of Universal films. The Government, on the other hand, argues that the amendments do not reveal a termination of the price fixing conspiracy; Screen Gems would be influenced by the fees received for Columbia films in determining the "fair market value" of Universal films; and Screen Gems is still required to permit Universal to inspect books and records relating to sub-licensing of both Columbia and Universal films. Because of the disposition being made of the instant motions, we need not resolve the conflicting views on the amendments to the contract.

The other contract provisions pointed to by the Government require Screen Gems to maintain complete accounts, books and records of each sub-licensing of Universal films as well as each such transaction of Distributor from January 1, 1956, to the termination of the license term for Columbia pictures (Section XI.1). It is provided further that Universal has the right to examine and make copies of all such "books, records, papers, documents, contracts, agreements, sub-licenses, correspondence, cancelled checks, vouchers, bills and statements" relevant to Columbia or Universal pictures (Section XI.2).

In the guaranty agreement, Columbia undertakes to maintain working control of Screen Gems during the license term; Screen Gems will continue to be sole licensee of Columbia films; Columbia guarantees payment to Universal of all moneys to become due under the license agreement, as well as full, faithful and timely performance of all obligations of Screen Gems to Universal.

The Government's position, as stated in its memorandum, is "that, although Columbia and Universal hitherto have been competitors in the licensing of their own feature film libraries for theatrical showing, Columbia has now undertaken (through its wholly-owned subsidiary, Screen Gems) television distribution of Universal's films on the 'terms and conditions' which are 'formulated jointly' by the two companies * * *. In other words, the agreement provides that Columbia (through Screen Gems) and Universal shall jointly determine the prices at which Universal's films will be licensed, and that such terms shall be no less favorable for Universal than for Columbia pictures." This makes the agreement, in the Government's point of view, a price-fixing arrangement "illegal *per se*" (United States v. Masonite Corporation, 1942, 316 U.S. 265, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461; United States v. Line Material Co., 1948, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260).

The defendants, denying any unlawful "price-fixing", argue that the legality of the "Distribution Agreement" (which they characterize as a "common sales agency") is not to be tested by abstract "per se" rules but by application of "the rule of reason" requiring an analysis of the market in which these films are offered and ascertaining the effect of the operation of agreement in that market. If this be so, then summary judgment cannot be granted because the parties have basically different views as to their

respective positions in the market relevant to the inquiry in this suit and as to the competitive quality of their film in that market.

The purpose and theory of the Sherman Act, as well as of all anti-trust laws, is to foster competition and strike down combinations, agreements or conspiracies designed to, or effecting, unreasonable restraints of trade or commerce. Within the broad framework of this ultimate purpose, however, not every agreement affecting prices is illegal *per se*. In the words of Mr. Justice Brandeis in Chicago Board of Trade v. United States, 1918, 246 U.S. 231, at page 238, 38 S.Ct. 242, at page 244, 62 L.Ed. 683:

> "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."

The basic principles of Chicago Board of Trade, supra, are still applicable and contractual restraints fall under the condemnation of Section 1 only when their purpose and effect is found to have imposed an undue restraint on commerce. This is to be determined in the light of the market in which the contracting parties compete and the products they offer. The standard of reasonableness is still "to be the measure used for the purpose of determining whether, in a given case, a particular act had or had not brought about the wrong against which the statute provided." Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619.

It was by the application of standards of reasonableness and through the "rule of reason", experience and logic, that it has been held that some contractual restraints imposed by agreements between competitors can, as a matter of law, operate only as unlawful and condemned restraints, which if left to continue may eventuate in monopolization. Thus, by the use of reason, logic and experience, it has been declared that agreements between competitors to fix prices (United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129); to allocate territory (Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136); to tie in on sale patented with unpatented products (International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20); and to boycott other competitors (Eastern States Retail Lumber Dealers' Association v. United States, 1914, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490), are unlawful without occasion or necessity for further judicial factual inquiry. Such contractual restraints agreed to by competitors, actual or potential, have been labelled "per se" violations of Section 1. However, before we may say that such agreements are inherently unlawful, we must find that the agreements were made between competitors, actual or potential, dealing in competing products in a relevant market. This was the Supreme Court's approach in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, when it said:

> "The Court of Appeals erred in holding that an agreement *among competitors* to fix maximum resale prices of their products does not violate the Sherman Act * * *"

(340 U.S. at page 213, 71 S.Ct. at page 260) italics supplied.

And in United States v. Masonite Corporation, 1942, 316 U.S. 265, 62 S.Ct. 1070, 1073, 86 L.Ed. 1461, upon which the Government relies on this motion, the Court found that all defendants "maintain selling organizations and to a large extent compete in the same markets"; furthermore, "in this case the price regulation was based on mutual agreement among distributors of competing products, some of whom had competing patents * * *". In the light of these findings, the Court said:

> "The power of Masonite to fix the price of the product which it manufactures, and which the entire group sells and with respect to which all

have been and are now actual or potential competitors, is a powerful inducement to abandon competition."

■ Our inquiry is directed to determine whether Columbia and Universal are competitors in the distribution of films embraced within the agreement. This leads to a consideration of the nature and type of their products and the demands and requirements of the market in which these products are offered.

The Government has attempted to spell out that Columbia and Universal occupy competitive positions as a matter of fact and law. In this effort, several sections of the "Distribution Agreement" are pointed out, including provisions relating to theatrical distribution of the films, and the reservation to Universal of the right to license the films for closed circuit, toll or subscription home television.

Defendants maintain that while Columbia and Universal "were and still are competitors in the production and distribution of motion pictures for theatrical exhibition, Universal has never competed in producing or distributing film for television programming (except for one disastrous effort); * * * Universal had none of the experience or personnel required to enter the quite different market of distributing film for television programming."

Defendants also deny that their feature films are competitive in the television market; rather, they say, Columbia and Universal feature films complement each other. This is so, it is urged, because effective programming requires the availability of numbers of similar types of pictures for showing in a series. The defendants contend that neither Columbia nor Universal had sufficient pre-August 1948 films to offer an attractive programming package for series presentation, and that therefore they are not in a position to offer competitive products to the television purchasing public. That there is, at this posture of the suit, some plausibility to this contention may be seen from the fact that in three of the four "packages" of films, released by Screen Gems since execution of the challenged agreement, both Columbia and Universal films were included.

Concerning the market in which feature films are distributed for television showing, the defendants urge that feature films have of recent years developed an "audience appeal" that they did not formerly enjoy, that feature films formerly scheduled for a showing on programs late in the evening when the maximum audience was not available now have become competitive with the offerings of the network transmissions and with the syndicated film offerings. It seems, if this be true, that feature films today compete for a market which embraces all the available time for television showings, not only on the smaller local stations not part of a large or national network, but on all stations, large and small when measured from the location of the station, its power or area of broadcast and possible or available audience.

The defendants also urge that the market in which they now jointly are selling these films, is not restricted to feature films alone, but includes the offerings of network programs and the offerings of syndicated and similar programs; and, too, that the field includes all hours of broadcasting and not the less desirable hours of poor "audience appeal". With the Government taking the position that individual feature films of the type embraced in the agreement are the requirement of the market, a factual issue is presented for trial for it may not be found that Universal and Columbia are competitors without first determining the market and its demands.

Substantial evidence is submitted by defendants, by way of affidavits, that in determining the market for consideration of the "Distribution Agreement" all television programming material must be considered together. This includes live shows, kinescopes of programs originally presented live, feature films, half-hour, hour and hour-and-a-half shows produced for initial television viewing, cartoons and shorts. The affidavits of responsible television officials who are familiar with

the needs of programming and the buying of material state that feature films, offered separately or in "packages", are not considered in a class apart from other material; their choice of programs is based on prices of all available shows, programs offered by competing stations, "audience appeal", station variety, and other similar factors. In short, a substantial question is raised which must await a trial as to whether the separate and limited available offerings of Universal and of Columbia do in fact constitute salable or competitive products.

■ We conclude that this suit cannot be disposed of summarily by motion, but must await a full hearing at which disputed genuine issues of fact may be resolved. The summary judgment procedure is not designed to eliminate a trial of contested issues going to heart of the controversy presented by this suit, or by stamping the challenged agreement with an "illegal per se" label without first finding whether Universal and Columbia are in fact competitors with reference to the pre-August 1948 feature films made subject to the agreement.

We turn now to the Government's motion for a preliminary injunction pendente lite. Here it is sought, during the pendency of this suit, (1) to enjoin Columbia and Screen Gems from taking any steps for the further sub-licensing of or otherwise distributing any of the 152 Universal films already placed in distribution by Screen Gems, provided that Screen Gems may take whatever steps may be necessary to perform sub-licensing agreements covering any feature films entered into prior to the issuance of the injunction, and (2) to enjoin Columbia and Screen Gems from releasing, sub-licensing or otherwise distributing any other Universal feature films covered by the distribution agreement. The justification for a preliminary injunction is "the detriment to the public interest which will ensue, if this Court is unable to render adequate relief in the event plaintiff is successful after trial."

The yardstick to be applied in determining whether the Court in the exercise of discretion should grant the drastic remedy of preliminary injunction, which in this case will be tantamount to the final relief sought, has been stated by the Court of Appeals for this Circuit:

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 740.

What we have said on the summary judgment motion is applicable to a consideration of the questions raised "going to the merits" of the Section 1 Sherman Act claim in this suit. In the Clayton Act phase, the Government alleges that the distribution agreement constitutes the illegal acquisition of an asset by Screen Gems in violation of Section 7.

Section 7 of the Clayton Act provides:

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Admitting that there is a factual question, at least as to the relevant market, before a Section 7 violation can be established, the Government did not seek summary judgment on this aspect of its

complaint. The approach to a Section 7 case has recently been succinctly stated by Judge Hincks in American Crystal Sugar Company v. Cuban-American Sugar Company, 2 Cir., 259 F.2d 524, 527:

"Section 7 in its present content, so far as here relevant, now forbids the acquisition of the whole or any part of the stock or assets of a corporation where, in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition. 15 U.S.C.A. § 18. The legislative history of the amendment makes it plain that Congress intended by § 7 to forbid mergers which were beyond the reach of the Sherman Act as judicially interpreted. Sen.Rep. 1175, 81st Cong., 2d Sess. 4–5(1950). Thus under § 7 as amended the Sherman Act test is no longer appropriate, H.R.Rep. 1191, 81st Cong., 1st Sess. 8(1949), and conduct may fall under the ban of amended § 7 before it has attained the stature of an unreasonable restraint of trade. See Pillsbury Mills, Inc., 50 F.T.C. 555, 569(1953). And the ban on a substantial lessening of competition 'in any line of commerce in any section of the country,' requires, for determination of a violation, first, a definition of a relevant market in which a lessening of competition has probably occurred and, second, analysis of the nature and extent of the competition within that market. Consequently, the parties are agreed that an acquisition is not illegal because of its impact on competition between the corporations involved: that the proper test is one of the *qualitative* substantiality of the resulting effect on competition in the relevant market. We too agree. We hold that only an acquisition which in the long run may reasonably be expected to substantially lessen competition within a relevant market, will violate § 7 as amended."

■■ We have previously noted the differing views of the demands of the market applicable to this suit. Before a Section 7 violation can be found, there must be a showing of a reasonable probability of foreclosure or substantial lessening of competition in a substantial share of the relevant market. Defendants point not only to the fact that Columbia and Universal have never competed in the television market, but also to the fact that no less than 65 companies license feature films for television exhibition. Defendants consider as competitors at least 235 distributors of filmed material, together with numerous sellers of live programming which are also competing with Screen Gems.

In the face of this evidence, can we say at this time that the combination of Universal and Columbia films in unified distribution by Screen Gems limited to these specific pre-August 1948 feature films is likely to result in undue reduction in the number of firms selling programming material for television showing? We think not.

An injunction in the form suggested by the Government will drastically interfere with the orderly release of films under the Agreement. Films for greatest income potential, it seems, must be available in series, and licensing arrangements are made months in advance. So far as the information is available presently to the Court, neither Columbia nor Universal alone has sufficient feature films available for profitable packaging. Serious interruption in the orderly release of films by Screen Gems will result in losses which may never be recouped even though the Government be not successful in the final judgment.

We cannot lose sight of the delay in seeking injunctive relief. The contract was executed on August 2, 1957 and dated as of July 1, 1957. Prior to its execution, representatives of the Government were aware of the impending agreement and held conferences with the defendants. Shortly after August 2, 1957, copies of the "Distribution Agreement" were furnished to the Government. It was not until eight months later that this suit was filed on April 10, 1958 and

still no injunctive relief was sought. The motion for a preliminary injunction was brought on by order to show cause dated October 14, 1958.

No act of the defendants can account for the fourteen months delay during which the Government permitted Universal films to be sub-licensed under the agreement. During that time, defendants released only 152 Universal films in what appears to be an orderly exercise of prudent business judgment. No dumping of films or release with inordinate haste has been undertaken. Moreover, both the Government and defendants have expressed a willingness to be ready for trial within three months of the filing of this decision. Accordingly, we cannot say that the "balance of hardships tips decidedly toward plaintiff".

There is little likelihood, if the past rate of release is continued, that a serious detriment to the public interest will ensue because of the number of films which will be released between now and the trial, which can be had within three months. Prudent business judgment, on the part of defendants, would seem to preclude anything but an orderly release of films which the agreement envisions over the period of the next twelve years. The stake is too high to permit of any other course of release. Defendants have raised issues which seriously challenge the Government's theory of action, and success by the plaintiff is far from clear.

The motion for preliminary injunction at this time is partially granted, to maintain the status quo, without prejudice to the right of the Government to apply further for injunctive relief if subsequent facts should develop warranting renewal of this motion, and Screen Gems will be restrained hereafter and until trial from sub-licensing additional Universal films at a rate greater than 50 in any six month period with leave to the defendants to apply for modification if the Government unduly delays the commencement of the trial or subsequent events warrant modification.

Settle order.