247 F.Supp. 308 (1962)
UNITED STATES of America, Plaintiff,
v.
ALUMINUM COMPANY OF AMERICA and Cupples Products Corporation, Defendants.
No. 61 C 147(2).
United States District Court E. D. Missouri, E. D.
July 30, 1962.
Final Judgment December 4, 1964.
Order Modifying Order April 16, 1965.
*309 Lee Loevinger, Asst. Atty. Gen., Charles L. Whittinghill, and Edna Lingreen, Chief Counsel, U. S. Dept. of Justice, Washington, D. C., Joe E. Waters, Francis A. Kareken, and James F. Buckley, Attys., Dept. of Justice, Washington, D. C., and Richard D. Fitz-Gibbon, Jr., U. S. Atty., St. Louis, Mo., for plaintiff.
Thos. S. McPheeters, Jr., Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., William K. Unverzagt, Pittsburgh, Pa., Herbert A. Bergson and Bergson & Borkland, Washington, D. C., for defendants.
MEREDITH, District Judge.
This suit was filed April 27, 1961, by the United States of America alleging jurisdiction under § 15 of the Clayton Act to prevent the violation of § 7 of said Act, 15 U.S.C.A. § 18. The petition alleges that on January 25, 1960, Aluminum Company of America (hereinafter called Alcoa) acquired all of the outstanding shares of Cupples Products Corporation (hereinafter called Cupples) in *310 exchange for stock of Alcoa pursuant to an agreement of November 20, 1959. The prayer asks that the acquisition of the stock of Cupples by Alcoa be adjudged a violation of § 7 of the Clayton Act and that Alcoa be required to divest itself of the stock and interest in Cupples.
On May 22, 1962, the plaintiff filed a Motion for Preliminary Injunction which has been briefed by defendants and plaintiff, and oral argument has been heard. The Motion for Preliminary Injunction asks that the defendants be restrained from building an Alcoa plant at Corona, California, (hereinafter referred to as the West Coast Plant) for the fabrication of aluminum residential and non-residential windows, doors, door frames, entrances, and curtain walls, and that Alcoa and Cupples be prevented from future commingling of Alcoa and Cupples assets and from transferring Cupples employees to Alcoa and from utilizing the Cupples employees in the construction and operation of any Alcoa facility.
The matter has been submitted on affidavits. For the government there were affidavits of J. E. Waters, attorney for the Department of Justice, Lionel Epstein, an employee of the Antitrust Division of the Department of Justice, Edna Lingreen, attorney for the Department of Justice, and Fred Miller, a supervisory architectural engineer with the General Services Administration. For defendants, there were affidavits of M. M. Anderson, executive vice president of Alcoa, Charles C. Moran, president of Cupples, and Donald H. Green, an attorney of the firm of Bergson and Borkland, representing defendants.

FINDINGS OF FACT
For the exclusive purpose of this Motion for Preliminary Injunction, we find the following facts:
1. Defendant companies are both engaged in commerce within the meaning of § 7 of the Clayton Act.
2. Of the six domestic producers of primary aluminum and aluminum semi-finished and finished products in the United States, only three, Alcoa, Reynolds and Kaiser, are fully integrated from mine to consumer. In 1960 these three controlled 88% of the domestic capacity for production of primary aluminum, Alcoa accounting for 38.6%, Reynolds, 26.4%, and Kaiser, 23%.
3. In 1960 Alcoa had total assets of $1,374,134,148 with profits for the year of $40,044,105 on net sales of $861,211,772.
4. In 1958 Alcoa's fabricating operations consumed the bulk of Alcoa's primary production. Fabricated products accounted for 76% of their revenues in 1958.
5. Recently further integration of the three primary aluminum producers has been attempted or achieved by acquisitions of wire and cable producers and aluminum foil producers.
6. The three primary producers of aluminum have expanded or attempted to expand in the field of fabricating aluminum extrusions, residential and non-residential windows, curtain wall, doors, door frames and entrances. Reynolds has expanded through the development of its own facilities. Kaiser has been enjoined by this Court from acquiring Kawneer Company, a leading independent fabricator of the above-mentioned products. Alcoa has acquired Cupples, one of the largest independent and most successful fabricators engaged in the production and sale of residential and non-residential windows, doors, door frames, entrances, curtain wall, suspended ceiling systems and highway and bridge guard railing.
7. Cupples' sales rose 44.4% over the five-year period 1955 through 1959, and its assets increased from $4,547,644 in 1955 to $5,855,587 in 1959 at the time of acquisition. In 1960 total assets were $7,800,000 with a liability to Alcoa of $3,200,000. On December 31, 1961, Cupples' total assets were $12,000,000 with a liability to Alcoa of $7,500,000.

*311 8. In 1959 Cupples had three plants located in St. Louis, Missouri; Dowagiac, Michigan; and Dallas, Texas. Products produced in St. Louis were extrusions, windows, curtain wall, suspended ceiling systems, highway railing, doors and trim; in Dowagiac, doors, door frames, entrances; and in Dallas, windows.
9. Of 12 million pounds of aluminum used by Cupples in 1959, 4,812,000 were purchased from Alcoa. Among the major customers of Alcoa producing residential and non-residential windows, doors, door frames, entrances or curtain wall, in 1959, Cupples ranked second in physical volume and third in dollar value of purchases.
10. In 1957 each of eleven fabricators used over a million pounds of aluminum for curtain walls, accounting for 65% of the total used in curtain walls that year. These eleven fabricators, in the order of their volume use of aluminum for curtain walls, were Cupples, Reynolds, Valley Metal, Michael Flynn, Ludman, General Bronze, Flour City, Adams and Westlake, Marmet, Fentron, and Browne Window.
11. Cupples' consolidated net profits after taxes were:

1955  $334,347.92
1956  396,419.53
1957  309,365.90
1958  343,130.13
1959  (-) 21,038.12

12. In 1960 Alcoa's percentage of extrusions shipped by all domestic producers was 19.6%. In that year manufacturers of building products were the largest single group of consumers of extruded products. Manufacturers of building products accounted for 46.3% of Alcoa's extruded products in 1960.
13. Windows, doors and curtain wall combined account for the largest endproduct uses of aluminum extrusions.
14. In the period from 1947 to 1960, aluminum, as opposed to steel and wood, has tremendously increased in its building use as follows:
Residential prime windows from 5% to 45%;
Non-residential prime windows from 11% to 66%;
Sliding doors from 10% to 92%;
Curtain walls, frames only, from negligible amount to 90%.
This increased use of aluminum is in part realized because of such characteristics as its light weight, variety of forms, textures and colors, resistance to corrosion, its colorless salts, its electrical conductivity and its freedom from maintenance.
15. Both Alcoa and Reynolds Metal Company, the other fully integrated aluminum producer with a product line similar to that of Cupples, have and will sponsor and control many large urban renewal projects providing a growing market for their aluminum fabricating subsidiaries in doors, door frames, entrances and curtain walls.
16. The total demand for aluminum for use in fabrication of curtain wall in the United States in 1957 was 38,000,000 pounds, increasing to 38,830,000 pounds in 1960. The total demand for aluminum use in curtain wall in the West Coast area in 1957 was 2,001,000 pounds, increasing to 6,414,000 pounds in 1960.
17. The West Coast area is a sizable and growing market for aluminum sliding doors and windows.
18. In 1959 prior to defendants' merger, Alcoa considered Cupples to be in direct competition with General Bronze, American Art Metal, Universal Corporation, Flour City Architectural, Rippel Architectural, Kawneer Company and Browne Window.
19. In 1959 prior to negotiations with Alcoa, Cupples planned to expand to the West Coast and was interested in finding a factory site in the Los Angeles area, considering Los Angeles their biggest single potential market.
20. Negotiations for the acquisition of Cupples began in July, 1959, and *312 plans for the acquisition were virtually complete in November, 1959. On January 22, 1960, Alcoa acquired all the outstanding stock of Cupples.
21. At the time of acquisition, Alcoa and Cupples agreed on expanding the business of Cupples Products in the West Coast area by establishment of a plant, which would probably be located in California.
22. Except for the production and sales of extrusions, products produced by Cupples were not manufactured and sold by Alcoa prior to the acquisition.
23. Extrusions produced by Cupples were primarily for their own use. Sales of extrusions by Cupples in 1959 amounted to $541,370 out of net sales of $14,861,589. This was less than one-tenth of one percent of the market for such extrusions.
24. On February 21, 1961, an Alcoa press release announced that Cupples held an option on 40 acres of land at Corona, California, and planned to build a plant there. This press release was in error in that Alcoa rather than Cupples held the option. On March 1, 1961, a press release stated that the plant at Corona would be built by Alcoa and would be leased to Cupples. In June, 1961, it was announced in the press in the Corona area that Alcoa had exercised the option on the Corona site and that it was expected that Alcoa would build aluminum doors, windows and other assembly items. On February 1, 1962, it was announced that Alcoa had sold the Corona real estate to its subsidiary, Gateway Properties, Inc., and that Cupples would act as a construction agent for Alcoa in the building of the plant.
25. The decision that the West Coast plant should be clearly identified as an Alcoa plant and that Alcoa would finance the plant and would hold the title to the plant through Gateway Properties, Inc., its wholly-owned subsidiary, created for that purpose, was made in view of the risk that if it were a Cupples-owned and financed plant and if the acquisition of Cupples is determined a violation of § 7 of the Clayton Act and divestiture decreed, the West Coast plant would be subject to divestment.
26. All of the officers and directors of Gateway Properties, Inc., are Alcoa employees. Gateway entered into an agreement with Cupples whereby Cupples, as agent for Gateway, designed and is supervising construction of the plant and the ordering and installation of machinery and equipment. Under the agreement, Cupples is to be paid $50,000 for its services.
27. The building of the West Coast plant is substantially complete and operation is expected to begin in July, 1962. It is intended that the plant and facilities will be leased to Cupples for a term of years.
28. Alcoa's goal in constructing and operating the West Coast plant through its Cupples Division is to establish itself as the leader in products manufactured by Cupples with the ultimate objective of obtaining 40% of all business in the type products manufactured by Cupples.
29. Twenty-one Cupples employees, together with their families, already have been transferred to Corona, California, from their homes in St. Louis, Missouri. All personnel who will staff and operate the West Coast plant will be Cupples employees and will remain on the Cupples payroll. If divestiture is ordered, it is the intention of Alcoa that these and other West Coast plant employees will become Alcoa employees.
30. All products to be fabricated at the West Coast plant will be sold by the Cupples sales organization under the same name and in the same manner as products now made in the Cupples plants in St. Louis, Dowagiac, and Dallas. All customers served by the West Coast plant will be customers of Cupples.
31. Since the acquisition of Cupples by Alcoa, Cupples has been operated as *313 a separate subsidiary of Alcoa. Alcoa has considered making key Cupples employees Alcoa employees of the West Coast plant. No Cupples employees have been transferred to Alcoa. Business decisions have been made by Cupples' executive management, substantially the same personnel who conducted the business prior to the acquisition. The sales organizations of Cupples and Alcoa have not been integrated.
32. The appearance in small print of the legends "Alcoa, a Cupples Products Division" or "Cupples Products Corporation, a division of Aluminum Company of America" in Cupples advertisements has not submerged or dissipated the name of "Cupples".
33. The financial assets of Cupples have not been commingled with assets of Alcoa. They have been accounted for and maintained separately from the assets of Alcoa.
34. The investment of Alcoa in the new plant at Corona, California, is approximately $2,200,000.

CONCLUSIONS OF LAW
There is a dispute between the parties as to the legal standard imposed for purposes of a preliminary injunction. Defendants maintain that the plaintiff must show that it will suffer certain and irreparable injury and that it has a clear or probable right to relief on the merits. Plaintiff asserts that a preliminary injunction is justified when the plaintiff has raised serious and substantial questions of law and fact on the ultimate question of violation of § 7 of the Clayton Act that would so alter the status quo as to frustrate the Court's ability to provide effective relief and when the "balance of hardship tips decidedly towards the plaintiff".
First, the question on a Motion for Preliminary Injunction is not whether the plaintiff has a right to final relief, but whether the plaintiff has raised serious questions of law and fact on the merits of the ultimate issue. Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, at page 316, 60 S.Ct. 517, 84 L.Ed. 774. Chicago, Burlington and Quincy Railroad Co., et al., v. Chicago Great Western Railway Co., 190 F.2d 361 (CA 8th, 1951), citing Mayo v. Lakeland Highlands Canning Co., supra, advises:
An application for a preliminary injunction does not warrant a determination of issues of fact and law involved on the merits but raises the question of whether or not there were substantial questions of fact and law for determination and whether they were of such a substantial character as to require preservation of the status quo until ultimate determination.
See also Love v. Atchison, Topeka and Santa Fe Railway Co., 185 F. 321 (CA 8th, 1911); Hamilton Watch Company v. Benrus, 2 Cir., 206 F.2d 738.
Defendants further argue in this connection that because there is great dispute between the parties on the "line of commerce" and the "area of effective competition", such a dispute precludes a preliminary injunction. In support of this principle, defendants cite a number of district court cases and Warner Bros. Pictures v. Gittone, 110 F.2d 292 (CA 3rd, 1940). The ultimate issue in Warner Bros. Pictures v. Gittone, supra, was the right of defendant distributors to refuse to furnish the plaintiff exhibitor with first-run movies. The trial court granted the preliminary injunction which, on review, was held error because the relief did not preserve, but rather altered the status quo giving the plaintiff exhibitor a new status that it had not previously enjoyed. The error was in determining the ultimate fact and law at a preliminary stage on conflicting affidavits without a full hearing on the merits. United States v. Standard Oil Co., 1961 CCH Trade Cases, 70,131, is subject to the same interpretation in that the Court found the preliminary injunction would have the same effect as a final determination in favor of the government without a full hearing on the merits. Both Yonkers Raceway v. Standardbred Owners Ass'n, 153 F.Supp. *314 552 (D.C.N.Y., 1957) and United States v. Gimbel Bros., Inc., D.C., 202 F.Supp. 779, 1962 CCH Trade Cases 70,284, refer to facts and law in dispute which were major considerations of the respective courts in denying preliminary injunctions. Whatever those two decisions stand for, we are of the opinion that while disputed facts and law as to the ultimate issue will be considered by the Court on a Motion for Preliminary Injunction, the fact that there are disputed facts and law does not in itself prevent issuance of a preliminary injunction.
Second, defendants state that injury to the moving party must be "certain and irreparable" while the plaintiff maintains that the test is whether the "balance of hardship tips decidedly toward the plaintiff." The difference between these two tests, if any, is more in language than in substance and application. The following cases have used the "certain and irreparable" language, but have weighed the respective injuries of the parties: Chicago, Burlington and Quincy Railroad Company v. Chicago Great Western R. Co., supra; Pratt v. Stout, 85 F.2d 172 (CA 8th, 1936); Benson Hotel Corporation v. Woods, 168 F. 2d 694 (CA 8th, 1948); Love v. Atchison, Topeka and Santa Fe Railway Co., supra; United States v. Standard Oil (Indiana), supra; United States v. E. I. DuPont De Nemours & Co., 167 F.Supp. 957, 959 (D.C.Ill., 1958); United States v. Gimbel Bros., supra; United States v. Aluminum Company of America and Rome Cable, 1960 CCH Trade Cases 969,727. In United States v. Columbia Pictures, D.C., 169 F.Supp. 888, and United States v. Standard Oil (Indiana), supra, weight has been given to the nearness in point of time to the trial on the merits in balancing the injuries of the parties. It is our conclusion that the injury test to be applied is one of weighing the injuries of the parties as stated in Hamilton Watch Company v. Benrus, 2 Cir., 206 F.2d 738.
In this connection, defendants have raised the question of plaintiff's delay in filing a Motion for Preliminary Injunction seven months after it knew that the construction of the West Coast plant had begun. In view of the record before this Court on the varying plans for the West Coast plant, this contention has little weight in balancing the hardships of the parties.
Has plaintiff raised serious and substantial questions of fact and law going to the ultimate issue of whether the effect of Alcoa's acquisition of Cupples may be substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the country?
Congress intended through § 7 of the Clayton Act to prevent all mergers, vertical, horizontal and conglomerate, with demonstrable probable anti-competitive effects. Congress was concerned with the rising tide of economic concentration and the protection of competition, not competitors. But not all mergers were proscribed. A merger between two corporations, one financially sound and the other financially unable to compete, or a merger between two small companies to enable them to compete in a market dominated by large corporations were examples of combinations non-violative of § 7 of the Clayton Act. Brown Shoe Company v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 decided by the United States Supreme Court June 25, 1962. Alcoa, the largest of the three domestic fully-integrated aluminum producers, had assets at the close of 1960 of $1,374,134,148. Cupples, one of the largest independent fabricators of residential and non-residential windows, doors, door frames, entrances, curtain wall, suspended ceiling systems and highway and bridge guard railing, had assets of approximately $5,855,587 at the time of the merger. The production and sale of aluminum end products such as those fabricated by Cupples has historically been in the hands of small, non-integrated independent fabricators who rely for basic aluminum and aluminum semi-finished products on a primary aluminum market dominated by Reynolds, Alcoa and Kaiser. These latter three *315 companies control 88% of the domestic capacity for primary aluminum.
There is no evidence at this time that Alcoa's acquisition of Cupples was that of two small companies merging to compete in a market dominated by large corporations or was the merger of a financially healthy enterprise with a financially failing one. Thus, we think on the broader outlines of the question of the legality of the merger, substantial question has been raised.
The "area of effective competition" wherein the probable anti-competitive effects of the merger is to be tested is determined by reference to the product market and the geographic market. While the outer boundaries of a product market may be determined by the reasonable interchangeability of use or the cross-elasticity of demand or the cross-elasticity of production facilities, each economically significant submarket is to be examined for § 7 purposes and the boundaries of such submarkets may be determined by a number of factors, including the product's peculiar characteristics and uses. Brown Shoe Company v. United States, supra. On the record before this Court, the plaintiff has raised serious and substantial questions on the "line of commerce" in the vertical aspects of the merger where the probable future effect may be substantially to lessen competition or to tend to create a monopoly. These are complex questions which require future and more deliberative study after a full presentation of facts, but at this juncture it is clear to this Court that a preliminary injunction should issue to protect this Court's ability to decree effective relief should this merger be proscribed. § 7 of the Clayton Act, according to the Brown Shoe Company decision, was intended by Congress to provide authority for the Courts in arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency, and was intended to promote competition by the protection of strong, small, locally-owned businesses.
If the plaintiff ultimately prevails on the merits, we are unable to see serious injury to the defendants during the pendency of the litigation from the granting of this Motion insofar as it relates to commingling. Defendants, by affidavits, have indicated Cupples is and will be operated as a separate unit. If defendants do not intend to commingle, then this temporary injunction will not be injurious. On the other hand, if defendants' plans change and further commingling becomes imperative to them, then it is probable that the competitive situation will be seriously altered.
The plaintiff has requested this Court to require defendant Alcoa to deed the plant at Corona, California, to defendant Cupples and to do it before a trial on the merits. This does not seem appropriate at this time. If the plaintiff prevails on the merits and the Court then deems it advisable, it may be done at that time.
The defendants have stated that they intend to lease the plant at Corona, California, to Cupples and that Cupples will operate the plant. In order to prevent any change in the competitive situation from now until the conclusion of a trial on the merits, the Court will permit the defendants to carry out their expressed intentions and will also require that the products made at that plant be sold and advertised as Cupples products. This will prevent Alcoa from using Cupples employees and know-how to get into that phase of the business that they are not now engaged in and from becoming firmly entrenched in that field in their own name during the pendency of this trial.
If the defendants prevail on the merits, it will be no hardship on them to carry out this order since they will at that time own Cupples and have all of Cupples employees, good will and assets plus the plant at Corona, California. However, if the plaintiff prevails it would be impossible to then order Alcoa to divest itself of Cupples and at the same time permit Alcoa to own and operate a plant at Corona, California, which was conceived and developed by Cupples and its employees and which *316 would have the effect of permitting Alcoa to enter the market for fabricating windows and doors through an illegal merger.

ORDER
The Court, having examined the complaint filed on April 27, 1961, having heard and considered oral arguments on plaintiff's Motion for Preliminary Injunction filed May 22, 1962, and having considered affidavits and exhibits in support of and in opposition to the Motion,
Orders that, pending final disposition of this action, the defendants, Aluminum Company of America and Cupples Products Corporation, are hereby enjoined as follows:
1. From any further consolidating or commingling of any business assets, financial, good will, personnel or otherwise;
2. Defendant Cupples shall continue to exercise independent judgment and activity in its operations;
3. Defendants Alcoa and Cupples shall continue to publicize distinctly the name of Cupples in connection with products Cupples manufactures and to make no more pronounced indication of Cupples affiliation with defendant Alcoa than exists in the exhibits before this Court;
4. Defendants Cupples and Alcoa shall maintain separate pension plans;
5. Defendants Cupples and Alcoa shall maintain separate sales organizations;
6. Defendants Cupples and Alcoa are restrained from transferring any Cupples employees to Alcoa, and Alcoa is restrained from employing any of Cupples employees;
7. Defendant Alcoa is enjoined from selling or conveying any Cupples stock acquired by Alcoa;
8. Defendant Alcoa shall continue to hold the title to the real estate and equipment of the recently built plant at Corona, California, in its subsidiary Gateway Properties, Inc. This plant shall be operated by Cupples and the products made therein shall be Cupples products and shall be sold and advertised as Cupples products.
The Memorandum containing findings of fact and conclusions of law is adopted and by reference made a part of this Order.

FINAL JUDGMENT
This Court having conducted a trial as to plaintiff's complaint and having rendered its findings of fact and conclusions of law thereon, dated September 22, 1964, and having had a further hearing on November 24, 1964, relating to the entry of a final judgment,
It is hereby ordered, adjudged and decreed as follows:
1. The acquisition of the stock of defendant Cupples Products Corporation (Cupples) by defendant Aluminum Company of America (Alcoa) is in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;
2. Within one year from the date of the entry of this final judgment defendant Alcoa shall:
(1) divest itself of all right, title and interest in the assets (including all the real estate) which are located at Corona, California, and which have been operated by defendant Cupples; and
(2) divest itself of all ownership of the stock, share capital, assets, tangible and intangible, and other interest it may have in defendant Cupples;
3. Within sixty (60) days from the date of entry of this final judgment, defendant Alcoa shall submit to this Court for approval and to the plaintiff a detailed plan setting forth the manner by which defendant Alcoa proposes to accomplish the divestiture ordered in paragraph 2 hereof and a report stating the efforts made by defendant Alcoa to accomplish said divestiture. Within thirty (30) days after this submission, plaintiff shall notify the defendants of its objections, if any, to this plan. In the event that there are any such objections, the parties shall confer and, if they cannot *317 thereby resolve their differences, a hearing will be held and the differences resolved by this Court. Divestitures shall then be accomplished by defendants in accordance with the plan approved by the Court.
4. The divestiture ordered in paragraph 2 hereof shall be made in good faith as a going business, shall be absolute, unqualified, and unconditional and to a person or corporation in which defendant Alcoa does not own stock or financial interest;
5. The Order entered by this Court on July 30, 1962, shall remain in effect, subject to further order of this Court, Provided, however, that nothing contained therein shall prohibit defendant Alcoa from selling or conveying any of Cupples' stock, share capital or assets under the plan of divestiture approved by this Court pursuant to paragraph 3 of this final judgment.
6. Defendant Alcoa shall pay all taxable costs;
7. Jurisdiction is retained to enable any of the parties to petition for such further and different relief as may be necessary or appropriate to accomplish the terms of this final judgment or as may be necessary or appropriate for the construction or carrying out of this final judgment, for the enforcement of compliance therewith, and punishment of violations thereof.

ORDER MODIFYING ORDER OF JULY 30, 1962, TO PERMIT CLOSING OF CORONA PLANT
Having heard argument on defendants' motion to modify the order entered in this action on July 30, 1962, so as to permit defendants to close the plant at Corona, California, and having fully considered the arguments presented by plaintiff and defendants with respect to said motion, the Court is of the opinion that defendants are entitled to the modification which they seek because:
1. The Corona plant has been sustaining substantial and continuing losses and there are no reasonable grounds for believing that this condition will improve.
2. The substantial losses sustained as a result of the operation of the Corona plant are adversely affecting the strength and viability of Cupples, and will continue to do so unless the Corona plant is shut down.
Therefore, it is hereby
Ordered that notwithstanding paragraph 8 of the order entered in this action on July 30, 1962, defendants may close the plant located at Corona, California, which is presently being operated by defendant Cupples Products Corporation under a lease from Delcalo, Inc., a wholly owned subsidiary of defendant Aluminum Company of America, provided, however, that defendant Aluminum Company of America shall see to it that said plant is maintained in good condition, capable of being reactivated promptly.