FEDERAL DEPOSIT INSURANCE CORP., as Receiver for the National Bank of Washington, Plaintiff,

v.

Conrad CAFRITZ, Peggy Cooper Cafritz, John Doe, as Trustee Under an Escrow in the District of Columbia, Defendants.

Civ. A. No. 91–883 (CRR).

United States District Court, District of Columbia.

April 26, 1991.

As Amended April 26, 1991.

Ira H. Parker, Keith Ligon, and Jamey Basham of Federal Deposit Ins. Corp. and Ellen F. d'Alelio, Filiberto Agusti and George A.B. Peirce of Steptoe & Johnson, Washington, D.C., for plaintiff.

David R. Kuney and David Bullington of David & Hagner, P.C., Washington, D.C., for defendant Conrad Cafritz.

John R. Gerstein and William E. O'Brian, Jr., of Ross, Dixon & Masback, Washington, D.C., for defendant Peggy Cooper Cafritz.

MEMORANDUM OPINION.

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

Pursuant to the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990 [1], 12 U.S.C. § 1821(d) (1989 & Supp.1991) (hereinafter "the Taxpayer Recovery Act"), the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver of the National Bank of Washington ("NBW"), seeks an order placing certain assets of Conrad and Peggy Cooper Cafritz under the Court's control during the pendency of this litigation in order to ensure that the FDIC can recover approximately $18 million which Mr. Caf-

---

**1.** This statute was enacted as part of the Crime Control Act of 1990. *See* Crime Control Act of 1990, Pub.L. No. 101–647, tit. 25, § 2500 *et seq.*, 104 Stat. 4859–4879.

ritz owes to NBW/FDIC pursuant to certain loan agreements. The FDIC also requests the Court to appoint a trustee to manage the assets in question. Upon consideration of the FDIC's motion, the response of defendants Conrad Cafritz and Peggy Cooper Cafritz, and the applicable law, the Court hereby grants the FDIC's motion for temporary restraining order and the request for appointment of a trustee.[2]

## II. BACKGROUND

Beginning in April of 1990, Mr. Cafritz experienced difficulty in making repayment on loans issued by the NBW. Plaintiff's Complaint ¶ 1(d). The precarious commercial real estate market in the Washington area apparently took its toll on Mr. Cafritz, and throughout 1990, he defaulted on other loans from the NBW. See FDIC Complaint ¶¶ 11–17.[3] Under the terms of these various loan agreements, Mr. Cafritz is obligated to the FDIC for $16,738,352.05 for the outstanding aggregate principal balances of the delinquent loans, as well as for $1,871,062.68, in accrued but unpaid interest as of April 22, 1991. Mr. Cafritz is also liable to the FDIC for unspecified late payment premiums. See Plaintiff's Complaint ¶¶ 19–21. None of the parties have disputed Mr. Cafritz's liability under these loan agreements.

On or about April 12, 1990, Mr. Cafritz requested that the NBW postpone exercising any legal remedies on the loan agreements for four to six weeks. See Plaintiff's Complaint at ¶ 23–25; Opposition of Conrad Cafritz, April 23, 1991 Affidavit of Stephen Twohig at ¶ 3. Although the parties do not dispute the fact that Mr. Cafritz

requested forbearance on April 12, 1990, Mr. Cafritz does argue that his inability to repay the loans was due to a "liquidity problem" and that there was no real threat of insolvency. See Affidavit of Stephen Twohig, *supra* ("We indicated that we felt strongly that the total asset value of the portfolio of Conrad Cafritz exceeded the total liabilities.") Peggy Cooper Cafritz also claims that she never feared that her husband was insolvent. See April 23, 1991 Affidavit of Peggy Cooper Cafritz at ¶ 2.

According to the FDIC, the recently-enacted Taxpayer Recovery Act empowers the agency to avoid two fraudulent transfers made by Mr. Cafritz with the intent to hinder, delay or defraud the FDIC in obtaining repayment of certain monies owed to the FDIC in its capacity as receiver of the NBW. As to the first transaction, the FDIC argues that, only 2 weeks after seeking forbearance from NBW, Mr. Cafritz transferred to his wife, Peggy Cooper Cafritz, for no consideration, $760,000 in cash and an 8⅓% interest in Marital Deduction Trust Assets, which has an annual income of $240,000 and is estimated to be worth approximately $7 million. Plaintiff's Complaint at ¶ 26–27. The Cafritzes vehemently deny that this transaction was made without valid consideration, and explain that the transaction satisfied certain preexisting and future debts between husband and wife. According to Peggy Cooper Cafritz, some of these debts were incurred by Mr. Cafritz under a prenuptial agreement, and other debts relate to loans made by Mrs. Cafritz to her husband independently

---

**2.** Given the short notice to the defendants, the Court now addresses only the limited issues necessary for a ruling on the temporary restraining order, and will consider evidence at the preliminary injunction hearing. *Cf. Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers,* 415 U.S. 423, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974). 11 C. Wright & A. Miller, *Federal Practice & Procedure,* Civil § 2953, at 188 (1973 & Supp.1991) (hereinafter, "Wright & Miller"). The Court prefers to consolidate a hearing on the preliminary injunction with a hearing on the merits. Because the FDIC has not requested a jury trial in its complaint and disavowed a desire for jury trial before the

Court on April 25, 1991, the Court will tentatively consolidate the hearing. However, if the defendants can persuasively show an entitlement to trial by jury, the Court will reconsider the decision to consolidate. See Fed.R.Civ.P. 65(a)(2). *Cf. Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

**3.** The NBW also felt the aftershock of the commercial real estate slump in this area. The bank essentially collapsed beneath the weight of its bad loans, and in November of 1990, the FDIC was appointed as the receiver. Plaintiff's Complaint ¶ 1.

of the prenuptial agreement. *See, e.g.*, Exhibit H and Exhibit A appended thereto, April 23, 1991 Affidavit of Peggy Cooper Cafritz (listing wife's claims against husband).

The FDIC also challenges a second transaction in which Mr. Cafritz transferred $1.5 million to a John Doe as a retainer fee for future legal services should Mr. Cafritz enter bankruptcy. Plaintiff's Complaint at ¶ 33–37. The FDIC again alleges that this money was transferred without valid consideration and was an attempt to hinder, delay or defraud the FDIC. Mr. Cafritz acknowledges that this transfer occurred in January of 1991, and claims that this money is in the general retainer fund at the law firm of Weil, Gotshal & Manges. Opposition of Conrad Cafritz at 6, n. 9. A representative of Weil, Gotshal apparently told Mr. Cafritz that the firm required this type of retainer as a matter of standard practice in order to ensure payment of legal fees in "such a case." *Id.* Attachment B, Letter to Conrad Cafritz from Alan J. Pomerantz of Weil, Gotshal & Manges, dated April 23, 1991.

Mr. Cafritz presently is negotiating with some of his creditors, which formed a Creditors Committee, to work out his financial difficulties outside of the formal bankruptcy process. This Creditors Committee negotiated a tolling agreement with the Cafritzes on April 22, 1991 as to their Spousal Assets, extending the time within which the creditors may file an involuntary bankruptcy petition or an action to set aside any fraudulent transfers. *See* Attachment C to the Opposition of Conrad Cafritz. (hereinafter, "tolling agreement"). As part of this tolling agreement, Mrs. Cafritz agreed not to encumber or dissipate in any way the 8⅓% vested remainder interest transferred by her husband in April of 1990. *Id.* The tolling agreement does not cover any part of the $760,000 cash transfer. *Id.* The FDIC is not part of the Creditors' Committee, and did not sign the tolling agreement. *See* Plaintiff's Reply at 10, n. 7.

III. BECAUSE OF THE SUBSTANTIAL LIKELIHOOD THAT THE FDIC COULD PREVAIL ON THE MERITS, THE STRONG PUBLIC INTEREST IN RECOUPING THE TAXPAYERS' LOSSES RESULTING FROM BANK FAILURES, AND THE ABSENCE OF ANY IRREPARABLE INJURY TO OTHER PARTIES AS A RESULT OF THIS ORDER, THE COURT GRANTS THE TEMPORARY RESTRAINING ORDER

■ As a general matter, a court can issue a temporary restraining order only if the moving party establishes: (1) that the party will suffer irreparable injury if the relief is not granted; (2) that there exists a substantial likelihood of success on the merits; (3) that issuing the temporary restraining order would serve the public interest; and (4) that other interested parties will not suffer substantial harm if the temporary restraining order is granted. *See Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989). *See generally* Fed.R.Civ.P. 65.

The Taxpayers Recovery Act expressly amends the traditional Rule 65 requirements, though. The Act permits any court of competent jurisdiction, at the request of the Corporation in its capacity as a receiver for any insured federal depository institution, to exercise its equitable powers to

> issue an order in accordance with Rule 65 of the Federal Rules of Civil Procedure, including an order placing the assets of any person designated by the Corporation or such conservator under the control of the court and appointing a trustee to hold such assets.

12 U.S.C. § 1821(d)(18). In seeking a restraining order, however, the FDIC does *not* have to show that it will suffer immediate and irreparable harm if the Court does not grant the requested relief:

> Rule 65 of the Federal Rules of Civil Procedure shall apply with respect to any proceeding under paragraph (18) without regard to the requirement of such rule that the applicant show that the injury, loss or damage is irreparable and immediate.

12 U.S.C. § 1821(d)(19)(A). Thus, in light of this express Congressional intent to override the traditional Rule 65 requirements, the FDIC must convince the Court that there is a substantial likelihood of success on the merits, that the relief is in the public interest, and that other interested parties will not suffer substantial harm if the Court grants the FDIC's request.

## A. THERE IS A SUBSTANTIAL LIKELIHOOD THAT THE FDIC WILL PREVAIL ON THE MERITS

In order to meet the first requirement for issuance of a temporary restraining order, the FDIC must show a substantial likelihood of success on the merits. "All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win." Wright & Miller, *supra*, § 2948, at 452. The Court of Appeals in this Circuit has explained that a determination as to the likelihood of success is not a mere prediction of success by a given percentage. Rather, "(t)he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors [in the preliminary injunction inquiry]." *Washington Metropolitan Area, Transit Com. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).[4]

■ The FDIC's claims are two-fold. First, the FDIC asks the Court to place those assets, which were allegedly fraudulently conveyed to Mrs. Cafritz and the Weil, Gotshal law firm, under the Court's control pursuant to 12 U.S.C. §§ 1821(d)(17)–(19). For this first claim, the FDIC must show a substantial likelihood of success on the merits, *i.e.*, the FDIC must show that they may avoid the transactions in question pursuant to 12 U.S.C. § 1821(d)(17)[5], and that they are entitled to injunctive relief with respect to these assets.

The Court believes that the FDIC has presented a prima facie case as to the assets which were allegedly fraudulently conveyed. At this stage of the proceedings, the Court need not resolve the complex legal question as to whether 12 U.S.C. § 1821(d)(17) embodies a separate federal fraudulent conveyances law, or whether it merely codifies District of Columbia law[6], as suggested by the Cafritzes. Moreover, the Court need not make a finding as to the standard of proof required as a matter of law because it finds that there is a substantial likelihood, on the basis of the pleadings herein, that the FDIC can show that the two transactions in question were fraudulent conveyances even under the clear and convincing standard of proof advanced by the Cafritzes.

In finding that there exists a substantial likelihood of success on the merits, the

---

**4.** The Court notes, with some concern, that this case presents incredibly complex issues regarding a newly-enacted statute. Although some courts have refrained from granting a restraining order in these circumstances, *see, e.g., Miller v. American Tel. & Tel. Corp.*, 344 F.Supp. 344 (E.D.Pa.1972), it has now become widely accepted that refusing to grant relief merely because novel or difficult questions are presented "would deprive the remedy of much of its utility." Wright & Miller, *supra,* § 2948, at 457. *See also U.S. v. Aluminum Co. of America*, 247 F.Supp. 308, 314 (E.D.Mo.1964), *aff'd per curiam,* 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965).

**5.** Section 1821(d)(17)(A) provides, in relevant part: "The Corporation, as conservator or receiver for any insured depository institution ... may avoid a transfer of any interest of ... any person who the Corporation or conservator determines is a debtor of the institution, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Corporation or conservator was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, [or] the Corporation...." Section (B) provides that the FDIC "may recover, for the benefit of the insured depository institution, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer)...." Section (D) provides that "(t)he rights under this paragraph of the Corporation ... shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11."

**6.** The Cafritzes argue that D.C.Code § 28–3101 would define what constitutes a fraudulent conveyance for purposes of the new Taxpayers Recovery Act. Neither of the Cafritzes denies that the new federal law empowers the FDIC to avoid a transaction once the FDIC proves that the transaction was fraudulent.

Court must point out the Cafritzes' misconceptions regarding the proof required for fraudulent conveyances. The Cafritzes appear to argue that, because an "actual fraud" standard applies, there must be direct as opposed to circumstantial evidence such as the typical "badges of fraud". The Court does *not* accept the Cafritzes' erroneous interpretation as to how the "badges of fraud" operate in proving the existence of a fraudulent conveyance. The very opinion cited by Mr. Cafritz to show that some "direct" evidence of fraud is required belies this claim. In *District–Realty Title Ins. Corp. v. Forman*, 518 A.2d 1004, 1008 (D.C.1986), the court was addressing when, given the existence of certain facts, legal presumptions of fraud apply. The *Forman* case does not stand for the proposition that those trying to prove fraud must do so only by direct evidence. The case stands only for the proposition that legal presumptions of fraud are not appropriate and that factual findings of fraud must be made. In making its final factual determination, the court reviewed all of the evidence—both direct and circumstantial.[7]

Based upon a review of the pleadings and affidavits presented thus far, there is a substantial likelihood that the FDIC could convince the Court, by clear and convincing evidence, that the April 24 transaction between the Cafritzes was made with the intent to hinder, delay or defraud creditors. Even assuming, *arguendo,* that Peggy Cafritz gave valid consideration for the assets she acquired, a Court could look beyond this fact. Under 12 U.S.C. § 1821(d)(17)(C)(i), the transaction escapes the FDIC's reach only if the assets were "taken for value ... *in good faith.*" (emphasis added). Other circumstances may provide clear and convincing evidence of a lack of good faith in this instance. For example, a Court may refer to: the timing of the consummated transaction[8]; Mrs. Cafritz's acknowledgement that some of these loans and debts arise outside of the prenuptial agreement and were "due and payable" since 1986, *see* Exhibit H and Exhibit A attached thereto, Affidavit of Peggy Cooper Cafritz; and the undisputed allegation that, because the assets are "spousal", Mr. Cafritz will have the opportunity to enjoy them.[9]

Likewise, based on the Court's review of the initial pleadings and affidavits, the Court could find, upon clear and convincing evidence, that Mr. Cafritz paid the $1.5 million retainer fee to the Weil, Gotshal firm with the intent to hinder, delay or defraud his creditors. It is undisputed that, in light of his request for forbearance, Mr. Cafritz was experiencing financial difficulties of some variety during the late 1990 through early 1991 period. In fact, a court could conclude that the April 23, 1991 letter from Weil, Gotshal indicates that Mr. Cafritz had retained them because, at some level, he had reason to believe bankruptcy proceedings were imminent. *See* Attachment B, Opposition of Conrad Cafritz. The fact that Weil, Gotshal requested the retainer fee as part of its standard practice does not immunize Mr. Cafritz from a finding that the transaction was contemplated to maximize Mr. Cafritz's legal remedies while protecting the

---

7. Actually, Mr. Cafritz's argument would render it virtually impossible to prove intent to hinder, delay or defraud. Even in criminal cases, where the stakes are arguably higher, juries are permitted to consider and weigh both direct and circumstantial evidence of intent. *See, e.g., U.S. v. Haldeman,* 559 F.2d 31 (D.C.Cir.1977) (*en banc*), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). *See also* Criminal Jury Instructions for the District of Columbia §§ 3.01; 3.02 (published in 1978 by the D.C. Bar Association).

8. Although Mrs. Cafritz states that the April 24 agreement "was the product of months of discussions that preceded it," Affidavit of Peggy Cooper Cafritz ¶ 13, the Court could certainly find that the decision as to when to consummate the deal was prompted by the desire to keep money away from NBW under the loan agreements.

9. Note that this is a much broader claim than the one challenged by the Cafritzes. The Cafritzes point to Mrs. Cafritz's retention of her own lawyer in the work-out negotiations with creditors. Although this may evidence some effort to protect her individual interests, it does not refute the broader, undisputed fact that, because the couple remains married, Mr. Cafritz may enjoy these assets on a day-to-day basis in a more general sense.

law firm from the creditors' claims.[10]

Without making any final determination on the merits, the Court notes that the powers afforded to the FDIC under the restraining order provisions are new and untested. Thus, there is no reason to find that the FDIC's interpretation of the statute is erroneous at this stage of the litigation. Even if the FDIC must show that the retainer is "excessive" based on *In re McDonald Brothers Construction, Inc.*, 114 B.R. 989 (Bankr.N.D.Ill.1990), there is nothing to preclude a finding that the retainer is both excessive and unnecessary because, as the Creditors Committee apparatus demonstrates, Mr. Cafritz has various lawyers, other than Weil, Gotshal, and has actively sought to avoid bankruptcy.[11]

Although less apparent from the FDIC's pleadings, the FDIC's second claim asks the Court to freeze an unspecified additional amount, independent of the assets fraudulently conveyed, to preserve the status quo while the FDIC pursues its claims regarding Mr. Cafritz's $18 million indebtedness under the various loan agreements. In making this second claim, the FDIC must show a substantial likelihood of success on the merits, *i.e.*, that 12 U.S.C. §§ 1821(d)(18) and (19) permits the Court to freeze the assets of any person upon the recommendation of the FDIC in its capacity as receiver of NBW in order to protect the FDIC's interests *pendente lite*. The FDIC

contends that its entitlement to $18 million pursuant to the loan agreements, combined with the alleged fraudulent conveyances made by Mr. Cafritz after the loans were in default, warrants equitable relief under this provision.

Again, the operation of the statute is a question of first impression. There is no reason to reject the FDIC's position at this stage of the litigation. The Court believes that there exists a substantial likelihood that the FDIC could prevail on this claim. None of the parties have disputed Mr. Cafritz's indebtedness to NBW/FDIC under the loan agreements. As explained above, there also exists a substantial likelihood that the FDIC can prove that Mr. Cafritz made the alleged fraudulent conveyances. On this basis, the FDIC may demonstrate Mr. Cafritz's desire to dissipate assets at the expense of the FDIC. This is a strong basis, at this stage of the case, for the Court to exercise its equitable power.

■ The only refutation from the Cafritzes is that there is no proof of insolvency. This argument misses the point, however. There does not appear to be a requirement of insolvency under 12 U.S.C. §§ 1821(d)(18) or (19).[12] Under the statute, the FDIC need not prove the debtor's insolvency before recommending a freeze on assets to which it asserts title and about which there is a fear of dissipation. Once

---

**10.** The FDIC offers *Gibson v. RTC,* 750 F.Supp. 1565 (S.D.Fla.1990) and the cases cited therein in support of the proposition that such retainer fees are presumed invalid in these circumstances. These cases do not stand for this proposition at all. The *Gibson* case, and those cases cited therein, deal with the government's ability to repudiate contracts made by a *bank* which are *burdensome* in order to promote "the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e). The fraudulent conveyance argument advanced in this case arises under a separate statutory provision and presents different legal and factual hurdles in order for the FDIC to prevail. The case does bolster the proposition, however, that retainer fees are not *per se* beyond the reach of the law, provided the FDIC meets the appropriate standard.

**11.** Again, while not addressing the merits, the Court notes that the *McDonald Bros.* opinion did not address the particular powers granted to the FDIC by the Taxpayers Recovery Act, and may

not have any weight outside of the bankruptcy context. Also, even if the bankruptcy laws would guide the Court's interpretation of this new statute, the FDIC could certainly make some showing that the retainers were fraudulent conveyances under 11 U.S.C. §§ 544(b), 548, and 550. The *McDonald Bros.* opinion is merely speculating as to the showing a plaintiff *could* make under these potentially analogous bankruptcy statutes without coming to any final conclusion. *McDonald Bros., supra,* 114 B.R. at 1000 n. 13.

**12.** This statement, of course, does not preclude a later showing by the Cafritzes that such a requirement should be imported into the statute. At this preliminary stage, it is not necessary for the Court to address such a broad claim, especially when the defendants have not advanced any support for this bald proposition. In any event, the FDIC has proffered sufficient evidence that its assets are in jeopardy, thereby warranting the temporary remedy.

the FDIC makes a recommendation to the Court that equitable relief is needed, the Court must then evaluate the FDIC's claims and balance the interests in determining whether the equitable relief is appropriate. The Court may consider the prospect of insolvency in weighing the competing interests.

## B. GRANTING THE TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST

By enacting the Taxpayers Recovery Act, Congress has evidenced its desire to take an aggressive position in minimizing losses sustained by taxpayers due to bank failures. The sponsor of the legislation explained that the traditional Rule 65 requirements were eased because the FDIC is "in the position of protecting the depository insurance fund, i.e., the taxpayers (sic) money." 136 Cong.Rec. E3686 (daily ed. Nov. 2, 1990) (statement of Representative Schumer). Moreover, the statute *"further expands* the power of conservators, receivers or liquidating agents to void fraudulent transfers" and gives regulators power "to enjoin the dissipation of assets wrongfully obtained." *Id.* at E3684 (emphasis added). Thus, even this sparse legislative history evidences Congress' seriousness of purpose in protecting taxpayers' interests.

Peggy Cooper Cafritz contends that granting the relief requested injures the public interest because "the public interest favors efforts by parties to work out their financial difficulties amicably and without beleaguering the judicial system." Opposition of Peggy Cooper Cafritz at 6–7.[13]

While this may be true as a general proposition, Congress has given the FDIC a green light to use aggressive tactics in protecting taxpayers' interests. This Court cannot coerce the FDIC to abide by standard operating procedures when Congress has clearly determined to wage battle under a new standard.

## C. THERE IS NO SUBSTANTIAL HARM TO OTHER INTERESTED PARTIES

In determining whether "substantial harm," *Sea Containers, supra,* 890 F.2d at 1209, will result to other interested parties as a consequence of a restraining order, the Court must evaluate the "substantiality, likelihood of occurrence and adequacy of proof" of any asserted harm. *Cuomo v. U.S. Nuclear Regulatory Com.,* 772 F.2d 972, 977 (D.C.Cir.1985). Mr. Cafritz argues that freezing the assets given to the law firm would "effectively deny Mr. Cafritz the use of legal counsel." Reply Memorandum of Conrad Cafritz at 8. Mrs. Cafritz contends that she will lose the benefit of the bargain made with the Creditors Committee if the restraining order is granted. Mrs. Cafritz alleges that, as part of the tolling agreement, she bargained for the right to retain the $760,000 cash while putting certain encumbrances on the more valuable vested remainder interest. *See* Opposition of Peggy Cooper Cafritz at 9–10. She argues that loss of the $760,000 is significant because "she had previously been counting upon the right to use" the money. *Id.*[14]

---

**13.** Both of the Cafritzes protest the alleged "bad faith" of the FDIC by filing this action. Regardless of any personal or professional courtesies upon which the FDIC may have trampled, the fact remains that the FDIC was not a party to the Creditors Committee agreements, and expressly reserved its rights when indicating its tentative approval of the tolling agreement. *See* Letter from Keith Ligon (FDIC) to Richard Brand and David Osnos (Creditors Committee) (dated April 19, 1991), Opposition of Conrad Cafritz, Attachment A.

**14.** A suggestion was made at the April 25, 1991 hearing that this Order may force Mr. Cafritz into bankruptcy. This claim was not made in the pleadings. In fact, Mr. Cafritz has defended

against imposition of the Order by arguing that there is no reason to believe that he is insolvent. *See, e.g.,* Opposition of Conrad Cafritz at 5–6. However, even assuming, *arguendo,* that the Order propels Mr. Cafritz into bankruptcy, this does not constitute a substantial harm outweighing the taxpayers' rights to be repaid. The actual effect of a bankruptcy petition on Mr. Cafritz and all of his creditors is unknown. An involuntary bankruptcy proceeding may actually resolve the stalemate, and may further everyone's interests. Although the Court truly sympathizes with Mr. Cafritz, Mr. Cafritz has no right to choose when, and in what form, he will repay his creditors.

Although Mrs. Cafritz will undoubtedly suffer a reduction in her income stream if the restraining order is granted, this does not *ipso facto* prove a substantial harm. Mrs. Cafritz has asserted the vitality of her husband's financial condition throughout her papers, *see, e.g.,* Affidavit of Peggy Cooper Cafritz ¶ 2, and the Court has no reason to believe that a serious change in her lifestyle will result from issuance of a temporary order of this nature. Thus, at this juncture, the Court concludes that no substantial harm would result vis-a-vis Mrs. Cafritz and the retention of the cash assets.

If the Court were to freeze Mr. Cafritz's assets, his ability to retain counsel in the event of a bankruptcy petition may be hampered. The Court must weigh this harm against the Congress' desire to recoup monies which the FDIC alleges were wrongfully obtained by, or in the possession of, Mr. Cafritz by virtue of his failure to repay monies owed to the FDIC. In balancing these competing interests, and in view of the fact that there is no *right* to counsel in bankruptcy, the Court concludes that the harm to Mr. Cafritz is not substantial and that temporary restraining order should issue.[15]

### IV. CONCLUSION

Upon consideration of the pleadings, the record developed thus far and the applicable law, the Court finds that there is a substantial likelihood that the FDIC will prevail on the merits of the claims asserted in its complaint. Moreover, the Court finds that the compelling interest in protecting the taxpayers' investment in the depository insurance fund and the lack of substantial harm to the interested parties weighs in favor of granting the relief sought by the FDIC. Because the Court grants the FDIC's request to freeze assets not to exceed $18 million, the Court hereby appoints the Citizens Bank of Maryland as trustee to receive, manage and exercise dominion and control over these assets during the pendency of this litigation. The Court will issue an order of even date herewith consistent with this Memorandum Opinion.

### TEMPORARY RESTRAINING ORDER

Upon consideration of the plaintiff's application for a Temporary Restraining Order, pursuant to 12 U.S.C. §§ 1821(d)(18) and (19), the defendants' responses thereto, the record and the applicable law, and in accordance with this Court's Memorandum Opinion of even date herewith, it is, by this Court, this 26th day of April, 1991,

ORDERED that the plaintiff's application for a temporary restraining order shall be, and hereby is, granted; and it is

FURTHER ORDERED that assets of the defendants, as described herein, shall be placed, as hereinafter provided, under the control of the Citizens Bank of Maryland, as trustee; and it is

FURTHER ORDERED that the following assets shall be transferred to the trustee on or before 4:00 p.m. on April 29, 1991:

—Mr. Cafritz shall immediately cause the law firm of Weil, Gotshal & Manges to transfer to the trustee the sum of $1.5 million, representing the retainer fee in payment for future legal services, on or before 4:00 p.m. on April 29, 1991, and that Weil, Gotshal & Manges, being officers of the Court and having notice of this action, shall comply with this Order in all respects at once;

—Mrs. Cafritz shall immediately transfer to the trustee those assets which were the

---

15. In this vein, the Court refers counsel to the recent Supreme Court case of *U.S. v. Monsanto*, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989). The Court upheld a statute, 21 U.S.C. § 853, authorizing courts to issue an *ex parte* pretrial restraining order to freeze assets which may have been obtained by virtue of the alleged continual criminal enterprise. Although this seizure adversely affected the defendant's Sixth Amendment right to retain counsel for his criminal trial, the Court found that the probable cause determination in the indictment was sufficient to justify a pretrial seizure. Although this case is not directly analogous, it supports the proposition that Congress can authorize forfeitures despite any adverse impact on the ability to retain counsel. In this civil context, the substantial likelihood on the merits test satisfies due process concerns just as the probable cause determination satisfied those concerns in a criminal case.

subject of the April 24, 1990 transaction with Mr. Cafritz, namely the $760,000 cash and the 8⅓ percent vested remainder interest, which is valued at approximately $7 million, on or before 4:00 p.m. on April 29, 1991;

—Mr. Cafritz shall immediately transfer to the trustee assets, representing the remainder of the $18 million owed to the FDIC under the outstanding loan agreements, of whatever variety, provided these assets have a current fair market value of approximately $9 million, on or before 4:00 p.m. on April 29, 1991; and it is

FURTHER ORDERED that the parties shall appear before the Court at 2:00 p.m. on May 1, 1991 for a status conference at which time the Court will schedule a further hearing or trial in this matter.