**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

No. 97-1566

National Credit Union Administration   *
Board, as conservator for Renville   *
Farmers Co-op Credit Union,   *
                                *
        Plaintiff-Appellee, *
                                *
      v.                  *  Appeal from the United States
                                *  District Court for the
Scott Johnson,             *  District of Minnesota.
                                *
    Defendant-Appellant,   *
                                *
Norman Westby,           *
                                *
        Defendant,   *
                                *
------------------------*-------
                                *
Lindquist & Vennum, P.L.L.P., *
                                *
        Appellant.  *

Submitted: November 17, 1997

Filed: January 15, 1998

Before BEAM, HEANEY, and JOHN R. GIBSON, Circuit Judges.

HEANEY, Circuit Judge.

Scott Johnson and his counsel, Lindquist & Vennum, P.L.L.P. (L & V), appeal the district court's grant of a preliminary injunction directing L & V to pay $72,325.04 to the National Credit Union Association Board (NCUAB). The law firm received the money from Johnson as a nonrefundable retainer for L & V's representation of Johnson in civil and criminal litigation arising out a check-kiting scheme with the Renville Farmers' Co-op Credit Union (Credit Union). We reverse.

## I.

Johnson bought and sold cattle and hogs. In November 1995, he owned approximately 8,200 head of cattle and 950 head of hogs, which he had placed in custom feedlots throughout the Dakotas, Minnesota, and Nebraska. In addition, he owned approximately 650 cattle at his farm.

In the late 1980s, Johnson began a practice whereby he would overdraw his bank account at the Credit Union, and at the end of the month, he would write checks on the same account to cover the deficiency. He was successful at using the float on the checks to appear to have a balanced account through the assistance of a Credit Union insider who processed Johnson's checks through the check clearinghouse system rather than as same day funds.[1] As

---

[1]By sending the checks through the clearinghouse system, Johnson's accounts were given credit for the deposit of the checks on the day he deposited them, and the debit from the same account would not occur for several days while the checks went

a result, Johnson avoided detection that his account was overdrawn by appearing to have a positive balance at the end of each month.  Through this process, Johnson ran up over $7.9 million in indebtedness to the Credit Union.

through the clearinghouse.

After the Minnesota Department of Commerce (Department) discovered the discrepancy created by Johnson's overdrafts, the Department declared the Credit Union insolvent on November 17, 1995. The Department first appointed the NCUAB as conservator and then receiver of the Credit Union.

On November 15th or 16th, Johnson received a demand to present a listing of all of his assets to the Credit Union by 8:00 a.m. on November 17, 1995. Lawrence Frank, an attorney who represented Johnson in discussions with the examiners, investigators and other officials, promptly introduced Johnson to L & V for the purpose of having the firm represent Johnson with respect to his potential civil and criminal liability arising out of the Credit Union transactions. L & V consulted Frank concerning whether the Credit Union had a security agreement covering Mr. Johnson's business assets, including his cattle. Frank indicated that based on assertions of the bank examiners and directors of the Credit Union, including the chairman, no security agreement existed.[2]

At a meeting on November 17, 1995, Johnson and representatives of L & V discussed the terms of a nonrefundable retainer agreement, and Johnson gave L & V third-party checks totaling $61,139.81 payable to Johnson

_____

[2]A security agreement did, in fact, exist regarding Johnson's assets of "livestock, machinery, equipment and inventory" filed with the Renville County Recorder, although it was not filed in the office of the Minnesota Secretary of State. By the time L & V discovered the agreement, the law firm had already commenced its representation of Johnson. Although the parties contest the validity of the security agreement, we need not address the issue for the purpose of this appeal.

4

from the sale of cattle and hogs. On November 20, 1995, Johnson signed over additional checks he received from the sale of cattle and hogs and miscellaneous sources totaling $11,185.23 also payable to Johnson. On the same day, Johnson and L & V entered into a nonrefundable retainer agreement in exchange for the $72,325.04 Johnson had given to L & V. The retainer agreement provides:

> We have discussed the retainer necessary for us
> to undertake your representation. By agreeing
> to represent you, we generally forego the
> opportunity to represent any other entity or
> individual with respect to your financial and
> related issues, without your consent.
> Furthermore, we wish to reduce or eliminate the
> risk of retainer funds being garnished or levied
> upon by potential or existing judgment
> creditors. Consequently, we have requested and
> you have agreed to pay us a non-refundable
> retainer of $72,325.04.

(Appellant's App. at 12.)

On November 22, 1995, Thomas Fabel, an attorney at L & V, had a telephone conversation with Robert Roach, the attorney for the NCUAB. Roach advised Fabel that the NCUAB had found no evidence of any liens or a security interest in Johnson's assets. Roach told Fabel he was interested in negotiating with Johnson to recover the assets because, in the absence of a security interest, it would take too long to obtain prejudgment attachment to secure amounts allegedly owned by Johnson.

On November 29, 1995, L & V met with Roach, Joseph Visconti, Director of the NCUAB, and an Assistant United States Attorney. At that meeting it was confirmed that the NCUAB was not aware of any written loan agreement or other formal security agreement covering the majority of Johnson's assets, including the cattle. L & V advised those present that it had a nonrefundable retainer agreement with Johnson. This fact was confirmed in a letter by L & V to Roach dated December 1, 1995.

6

On December 6, 1995, Roach confirmed that the NCUAB had yet to come across any loan agreement or other security instrument regarding the cattle, and he did not believe the NCUAB would find any such agreements or instruments. That same day the NCUAB filed suit against Johnson seeking injunctive relief requesting the immediate seizure of Johnson's assets and recovery of $7.9 million. The trial court issued an ex parte order on December 7 freezing Johnson's assets and setting a

temporary injunction hearing for December 15.  Following this hearing, the court issued a temporary restraining order freezing all of Johnson's assets and ordered a preliminary injunction hearing.  Prior to that hearing Johnson and his counsel stipulated to the issuance of a preliminary injunction, entered on December 22, 1995, naming the NCUAB as trustee to collect Johnson's assets.

Citing the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1787(b)(16)(A),[3] on February 9, 1996, the NCUAB demanded that L & V return the funds paid to it by Johnson for the nonrefundable retainer agreement.  L & V refused to return the funds and the NCUAB moved the district court for an order directing L &V to return the funds and holding L & V in contempt.  The NCUAB argued that Johnson gave the checks to L & V to hinder, delay, or defraud the Credit Union; that the Credit Union holds a valid security agreement in all of Johnson's assets; and that L & V had

---

[3]The FCUA provides:

The Board, as conservator or liquidating agent for any insured credit union, may avoid any transfer of any interest of an institution-affiliated party, or any person who the Board determines is a debtor of the institution, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Board becomes conservator or liquidating agent if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured credit union or the Board.

12 U.S.C. § 1787(b)(16)(A).  The Board may recover the property or value of the property exchanged in an avoided transfer under 12 U.S.C. § 1787(b)(16)(B), except in the case where the transferee took the property "for value, including satisfaction or securing of a present or antecedent debt, in good faith."  12 U.S.C. § 1787(b)(16)(C).

not received the payment in good faith. L & V argued that the court was without jurisdiction because L & V was not a party to the original order, that no one held a senior security interest prior to L & V, that Johnson made the transfer to secure legal

counsel, and that L & V took the checks for value and in good faith. The district court granted the NCUAB's order, stating that it was persuaded "at this time" that the nonrefundable retainer fee was transferred with the intent by Johnson to hinder, delay or defraud the Credit Union. In support of this finding, the court stated:

> The record establishes that L & V was aware of the claim made against Johnson's assets. L & V was informed that the records of the Renville CU showed an overdraft in Johnson's account of approximately $7.9 million, which would sufficiently establish Johnson was insolvent. Furthermore, the language of the retainer agreement establishes that the intent of entering into such a contract was not for the sole purpose [of] establishing L & V's availability to represent Johnson, but to "reduce or eliminate the risk of retainer funds being garnished or levied upon by potential or existing judgment creditors." This evidence is sufficient to support a finding that L & V did not take the checks in good faith.

National Credit Union Admin. Bd. v. Johnson, No. 3-95-1117, Mem. and Order, slip op. at 8 (D. Minn. Jan. 14, 1997). Johnson and L & V appeal.

## II.

We review the district court's grant of a preliminary injunction for an abuse of discretion. Coleman v. Turner, 838 F.2d 1004, 1006 (8th Cir. 1988) (per curiam). In so doing, we do not "pass . . . judgment on the underlying issues," but rather we "ensure that the injunction did not improperly issue on the basis of any clearly erroneous findings of fact or any clear error on an issue of law that may have affected the ultimate balancing of the

10

[factors considered for a preliminary injunction]."  <u>Olin Water Services v. Midland Research Lab., Inc.</u>, 774 F.2d 303, 307 (8th Cir. 1985).

A court generally considers four factors to determine whether a party is entitled to a preliminary injunction: (1) the threat of irreparable harm to the movant; (2) the balance between the potential harm and any harm that granting the injunction will cause

11

to other parties to the litigation; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). Where the NCUAB moves for a preliminary injunction, Congress has expressly removed the requirement that the movant show that irreparable harm will result without the injunction. 12 U.S.C. § 1787(b)(2)(H)(I).[4]

The FCUA makes it clear that the NCUAB, as conservator, is empowered to avoid a transfer made by a party to hinder, delay, or defraud the Credit Union, and that the NCUAB may reverse such a transfer unless the transferee received the property for value and in good faith. See note 3. In this case, the question turns largely on whether NCUAB can establish a reasonable probability of success on the merits.

Before we consider whether the district court abused its discretion, we address L & V's contention that the district court lacked jurisdiction to grant injunctive relief. L & V argues that the court lacked jurisdiction because L & V was not made a party to the action. We reject this argument. The FCUA specifically provides:

**(G) Attachment of assets and injunctive relief**

> Subject to subparagraph (H), any court of competent jurisdiction may, at the request of the Board (in the Board's capacity as conservator or liquidating agent for any insured credit union or

---

[4]The statute provides that "Rule 65 of the Federal Rules of Civil Procedure shall apply to [a proceeding placing assets under control of the NCUAB] without regard to the requirement of such rule that the applicant show that the injury, loss or damage is irreparable and immediate." 12 U.S.C. § 1787(b)(2)(H)(I).

in the Board's corporate capacity in the exercise of any authority under this section), issue an order in accordance with Rule 65 of the Federal Rules of Civil Procedure, including an order placing the assets of any person designated by the Board under the control of the court and appointing a trustee to hold such assets.

12 U.S.C. § 1787(b)(2)(G).

We believe that under this section, the district court had jurisdiction to issue the preliminary injunction in accordance with Rule 65 of the Federal Rules of Civil Procedure. L & V was named and served in the Rule 65 proceeding that resulted in the district court order requiring L & V to turn over to the NCUAB the funds that it had received as a nonrefundable retainer. L & V does not raise a due process argument, and we do not believe that one exists because L & V had notice of the proceeding and submitted affidavits in argument and support of its position. We turn now to the question of whether the district court abused its discretion in granting the preliminary injunction.

## A. Reasonable Probability of Success

The district court had to decide whether the NCUAB had a reasonable probability of success on two closely related issues: The first is did Johnson transfer the sum of $72,325 to L & V to hinder, delay, or defraud the Credit Union or the NCUAB; and the second is did L & V take the property for value and in good faith?

The FCUA has two important sections dealing with the NCUAB's powers with respect to transfers of any property within five years of the date that the NCUAB becomes conservator of a failing credit union. Section A permits the NCUAB to avoid any transfer of property made with the intent to burden, delay, or defraud the insured credit union or the board. Under this section, the intent of the transferor is the controlling factor. Rare will be the case in which the transferor admits that he intended to make an impermissible transfer. Intent will, in most instances, have to be proved by extrinsic evidence. Among

14

the more common badges of fraudulent intent at the time of a transfer are:

(1) actual or threatened litigation against the debtor; (2) purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer.

. . . .

"the confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud."

F.D.I.C. v. Anchor Properties, 13 F.3d 27, 32 (1st Cir. 1994), (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991)).  In this case there was actual or threatened litigation against the debtor and there was insolvency on the part of the debtor, but the debtor did not transfer all or substantially all of his property.  There was no special relationship between the debtor and transferee, and the debtor did not retain any of the property involved in the transfer.

Here, Johnson's intent was to obtain competent legal representation in a complicated bankruptcy case fraught with both criminal and civil issues.  There is no evidence that he intended to place the money transferred to L & V to put it out of the reach of the NCUAB and creditors.  If the sum transferred was unreasonable, clearly such an intent can be inferred, but the sum was clearly reasonable in light of the complexity of his legal problems.  Thus, the question becomes whether this transfer was illegal per se under the FCUA simply because the inevitable effect of the transfer will be to reduce the assets available for the Credit Union and other creditors.  We do not believe

16

that this result is dictated either by the plain meaning of the FCUA or the intent of Congress.  To put the matter simply, the FCUA does not prohibit a debtor of a credit union to enter into a nonrefundable retainer agreement, provided the payment is a reasonable one; and the NCUAB agrees that for the purposes of this appeal, we should assume that the retainer was a reasonable one.  Clearly Congress could prohibit such payments, but it has not done so.

The NCUAB argues that this case should be controlled by United States v. Monsanto, 491 U.S. 600 (1989). In that case, the question was whether the federal drug forfeiture statute gives the district court the power to freeze a defendant's assets in his possession even if he wishes to use them to pay for an attorney. The Supreme Court in a 5-4 vote held that the language of § 853 of the forfeiture statute was plain and unambiguous. It stated, "section 853(a) provides that a person convicted of the offenses charged in respondent's indictment 'shall forfeit . . . any property that was derived from the commission of these offenses." Id. at 607. We recognize that Monsanto gives some comfort to the NCUAB's position. We note, however, that the opinion deals only with funds in the possession of a defendant at the time the forfeiture order is entered and that the forfeiture requires that the defendant be convicted of a crime and the property forfeited be derived from the proceeds of the crime or used to facilitate the crime. We are reluctant to extend Monsanto to the facts of this case.

Even if we were to hold that Johnson's intent was an impermissible one, there remains the question of whether L & V took the $72,325 nonrefundable retainer for value and in good faith. There is no question but that L & V took the retainer for value. Indeed, no one argues that L & V did not give value for the fee. So the question is did it take the payment in good faith? L & V, of course, knew that Johnson was in deep trouble. It knew that it was likely that he would be faced with both criminal and civil litigation. It knew that the checks tendered were checks that would become part of the bankruptcy estate if it did not accept them in payment of its retainer agreement. It inquired as to whether the livestock, which Johnson sold, was covered by a security agreement and

18

received a negative answer. So the question is whether this conduct constitutes lack of good faith within the meaning of the FCUA. We do not believe that it does. L & V clearly was not obligated to represent Johnson unless it could be assured of payment. It reasonably relied on representations to it that the livestock that had been sold was not covered by a security agreement. So they were faced with the question of whether the FCUA made acceptance of the retainer an act of bad faith. The FCUA does not specifically define good faith and reported cases as of the date L & V

accepted the retainer fee indicate only that acceptance of a nonrefundable retainer from a bankrupt is improper only if the retainer was excessive or a means of hiding assets of the bankrupt. See, e.g., FDIC v. Cafritz, 762 F. Supp. 1503, 1507 (D. D.C. 1991).

On remand, the matter, of course, will be heard on the merits. See Olin Water Servs. v. Midland Research Laboratories, Inc., 774 F.2d 303, 308 (8th Cir. 1985).[5] If at that time the NCUAB can establish that the fee paid was an unreasonable one, examined as of the date of the transfer, then L & V will have to return the nonrefundable retainer, otherwise it will not. We simply hold as a matter of law that an insolvent debtor in a bankruptcy proceeding may pay a nonrefundable retainer to attorneys of his choice for representation if the amount paid is reasonable and is not taken from assets that the law firm either knew or should have known were secured at the time they were paid.

B.  Balance of Harms

We believe that the balance is equal in this case. Both parties can financially respond to any judgment

_____

[5]In University of Texas v. Camenisch, 451 U.S. 394, 395-96 (1981), the Supreme Court stated:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing, . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits . . . .

entered by the district court when the matter is heard on the merits.

C.  Public Interest

The final factor is whether granting the injunction was in the public interest.  For the reasons stated in the section dealing with the probability of success on the merits, we do not believe that a preliminary injunction was in the public interest.  Important as it is to protect the assets of credit unions from those who attempt to defraud them, the interests of the public will not be served by affirming the grant of the preliminary injunction.

## III.

For the foregoing reasons, we determine that the district court abused its discretion in granting a preliminary injunction in favor of the NCUAB.  The court's order directing L & V to return $72,325.04 to the NCUAB to be held in trust pending further proceedings is reversed.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.